UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
WILLIAM LYNN,

                     Plaintiff,                            NOT FOR PUBLICATION
                                                  **MEMORANDUM & ORDER**
    - against -                                 11-CV-917 (CBA)

COMMISSIONER OF SOCIAL SECURITY,

                     Defendant.

------------------------------------------------------------------x
AMON, Chief United States District Judge.

      Plaintiff William Lynn, *pro se*, brings this action under 42 U.S.C. § 405(g), seeking judicial

review of the Social Security Administration's denial of his claim for disability insurance benefits.

The Commissioner of Social Security moves unopposed for judgment on the pleadings under

Federal Rule of Civil Procedure 12(c).[1]  For the reasons set forth below, the motion is granted.

## BACKGROUND

### I.  Administrative Proceedings

      Lynn filed an application for disability insurance benefits on October 17, 2008.  (Tr. 144-

46.)  The application was initially denied on January 26, 2009.  (Tr. 64, 68-72, repeated at 74-78.)

Lynn timely requested a hearing (Tr. 80), which was held on February 1, 2010, before

Administrative Law Judge ("ALJ") Gal Lahat.  (Tr. 29-63.)  Lynn appeared with his attorney, who

had been retained since July 25, 2007.  (Tr. 65.)  After the hearing, the ALJ kept the record open to

allow Lynn's attorney to supplement it with any additional documentation regarding his claimed

disabilities.  (Tr. 11, 60-62.)  However, counsel provided no additional records.  The ALJ requested

and obtained additional evidence from an orthopedic medical expert, Dr. Louis Lombardi, and a

---

[1] Plaintiff failed to respond to the Commissioner's motion after being served at the two different addresses he provided. (See DE 1, at 1, 3; DE 12, 13.)

vocational expert, Amy Leopold, by way of interrogatories.  (Tr. 189, 325.)  The additional

evidence was proffered and admitted without objection from Lynn.  (Tr. 11, 200-01.)  On October

12, 2010, the ALJ found that Lynn was not disabled.  (Tr. 11-25.)  Lynn sought review of the ALJ

decision by the Appeals Council.  (Tr. 1-3.)  On December 23, 2010, the Appeals Council denied

his request for review, making ALJ Lahat's order the final decision of the Commissioner.  (Tr. 1-3.)

Lynn filed this action on February 23, 2011, claiming that the ALJ's decision was not supported by

substantial evidence and/or contrary to law.

## II.  Non-Medical Evidence

Lynn was born on January 9, 1965.  (Tr. 35.)  He currently lives in Queens, NY with his

mother and daughter.  (Tr. 149.)  He completed one year of college as well as special training at

"electrician, asbestos, and boiler school."  (Tr. 36, 165.)  From 1992-1999, he worked in

construction.  From 2000-2007, he worked as an electrician.  (Tr. 38, 162.)  He does not have an

electrician's license.  (Tr. 58.)

Lynn's application for disability insurance benefits was based upon back, neck, shoulder,

and ankle problems that began on June 20, 2007, when he was involved in a car accident.  (Tr. 156-

57, 161.)  On October 29, 2008, Lynn filled out a claimant's function report in support of his

application.  In it, he reported that he cares for his daughter by dropping her off and picking her up

from school and preparing meals.  He reported occasional trouble sleeping due to pain and

discomfort.  He did not have any trouble with personal care and grooming, and he was able to drive.

He was unable to engage in heavy physical activity and reported limitations in lifting, standing,

walking, sitting, climbing stairs, kneeling, squatting, reaching, and using hands.  He stated that he

could finish tasks he started, could follow spoken and written instructions, did not have memory

problems, and had never lost a job due to problems getting along with people.  Lynn described pain

2

in his upper and lower back and left shoulder, which was worse during cold or rainy weather. The pain did not radiate to other places. He reported having taken Percocet in the past for pain but that he did not like how the medication made him feel. (Tr. 147-59.)

On January 13, 2009, Lynn was surveilled by investigators from the New York Cooperative Disability Investigations Unit ("CDI") while he went to and from the site of a consultative examination. CDI had received a fraud referral from the New York Disability Determination Services regarding suspicions of potential malingering by Lynn. (Tr. 176-82.) The investigators observed Lynn as he left his house, drove to his appointment, walked in and out of buildings, and descended steps. The report of the investigation stated that Lynn appeared to have a normal gait and station with good posture. Overall, his movements appeared fluid with no stiffness in the left ankle or elsewhere. Lynn smoked two cigarettes with his left hand and in general appeared to use both upper extremities as needed with no hesitation. His arms swung naturally as he walked, and he appeared to turn his neck as needed as well. He also descended the five or so steps in front of the doctor's office building without difficulty and, though the investigator's view was somewhat obscured, appeared to climb into his van's higher cab without difficulty as well. (Tr. 178-79.)

At his hearing before ALJ Lahat on February 1, 2010, Lynn testified that back pain, which began after his June 20, 2007 car accident, interfered with his ability to work. He testified that the back pain prevented him from bending and that he experienced the pain sitting and standing as well. He testified that he wore a back brace and had regularly been receiving treatment from a chiropractor since the June 2007 accident. He had also been doing physical therapy. He had a prescription for Percocet, which he had stopped taking a few months after the June 2007 accident but started taking it again after a second car accident on November 24, 2009. (Tr. 38-42.) Lynn also testified regarding numbness and pain in his left shoulder, which prevented him from lifting.

3

He had been receiving physical therapy as well as chiropractic treatment for the shoulder.  (Tr. 41-42.)  Lynn also testified regarding neck pain that began in 2007 and became worse after the November 24, 2009 accident.  He testified that after the first accident, his neck pain lasted for about 3-4 months and then started to wear off, recurring only occasionally.  After the second accident, the neck pain became much worse and constant.  (Tr. 42-43.)  Lynn testified that pain from his fractured ribs following the first accident lasted 3-4 months.  (Tr. 43.)  Lynn testified that his right hip had started to bother him after the second accident and described the pain as a blunt pain, as if a piece of hot lead were sitting on his hip.  He was undergoing physical therapy as well as chiropractic treatment for his hip as well.  (Tr. 43-44.)

Lynn stated that he could walk for about ten minutes before it became painful, stand for about half an hour to 40 minutes, sit for about half an hour to 40 minutes, and lift about 10 pounds.  He testified he could not bend at all.  He performed no household chores except for cooking.  (Tr. 48-49.)  Every couple hours he lay down to rest for 30-40 minutes.  (Tr. 53.)  He could drive, but not for very long as he experienced discomfort if he sat for too long.  (Tr. at 55.)  Lynn was also taking three classes at Queensborough College.  He testified that he had failed one course the previous semester because of excessive absences due to pain.

Lynn also testified that he had been seeing a psychiatrist off and on his whole life, including the period from the 2007 accident until his hearing.  He testified he had been diagnosed with depression.  He described feelings of uselessness and anxiety.  He had been on Seroquel since the 2007 accident and had recently been prescribed Xanax as well.  (Tr. 44-48.)

Lynn testified regarding his two car accidents as well as an assault he suffered in 2002.  In the 2002 assault, Lynn testified he was stabbed in the head and beaten with a pipe.  He missed one day of work.  The first car accident occurred on June 20, 2007 when Lynn struck the bumper of a

4

parked vehicle while going around 30 miles per hour.  The second car accident occurred on

November 24, 2009, when a car ran a stop sign and struck Lynn.  (Tr. 53, 59-60.)

At the time of his hearing, Lynn was receiving unemployment benefits, for which he had

certified that he was ready, willing, and able to work.  (Tr. 37.)

**III.  Medical Evidence**

1.  Medical Record Evidence

Lynn sustained injuries on June 20, 2007 following a motor vehicle accident and was

admitted to the emergency room at New York Hospital Medical Center of Queens ("NYHQ").  (Tr.

220.)  He sustained a wound to the left upper arm, and an x-ray showed borderline findings of an

acute fracture on the left 5th and 6th ribs.  (Tr. 217-18.)

On June 26, 2007, Lynn returned to the emergency room at New York Hospital Medical

Center of Queens ("NYHQ") with left-sided chest pain.  Lynn was diagnosed with a rib fracture and

instructed to follow up with New York Medical & Diagnostic Center ("NYMDC").[2]

On July 16, 2007, Lynn was examined by Dr. Neil Morgenstern, a physiatrist, at NYMDC.

Lynn complained of left shoulder pain, left rib pain, and left ankle pain.  The physical examination

revealed AC joint tenderness, coracoid tenderness, and acromian tenderness in the left shoulder, as

well as a positive Neer's impingement sign.  The left rib was also tender.  The left ankle was

negative for tenderness.  Dr. Morgenstern's impressions were shoulder tendonitis and an ankle

sprain, and he recommended physical therapy, orthopedic consultation, pain management

consultation, and follow-up with other medical doctors.  Dr. Morgenstern also prescribed Darvocet.

(Tr. 263-64.)

---

[2] Lynn's recollection, as recorded by his chiropractor at NYMDC, Dr. Martin Gillman, was that he was told his x-rays were normal and discharged.  Then, about a week later, NYHQ contacted him and told him to return because a rib fracture in his 5th and 6th ribs had been detected.  (Tr. 236.)

That same day, Lynn also saw Dr. Martin Gillman, a chiropractor at NYMDC.  Lynn complained of recurring headaches, neck and upper back pain, left shoulder and left arm pain, discoloration on the left bicep, numbness and tingling of both hands, significant left chest pain, lower back pain, and left ankle and foot pain.  Dr. Gillman diagnosed Lynn with cervical and lumbar radiculitis; cervical and lumbar disc syndrome; rib fracture on the 5th and 6th left ribs; cervical, thoracic, and lumbosacral sprain / strain; and segmental dysfunctions at the C2, C4, C5, C6, T2, T5, T7, L3, L4, and L5 levels.  He recommended electromyography / nerve conduction studies (EMG / NCV) of the lower extremities and lumbosacral spine.  Lynn was advised to return after the examinations for a report of findings and treatment.  (Tr. 236-37.)

On July 18, 2007, Lynn saw Dr. Tabari, a podiatrist at NYMDC, for left ankle pain.  Dr. Hostin advised physical therapy and noted Lynn was to undergo EMG / NCV studies to rule out radiculopathy.  (Tr. 265-66.)

On July 26, 2007, Lynn saw Dr. Emmanuel Hostin at NYMDC, complaining of neck pain, left shoulder pain, left ankle pain, and rib pain.  Lynn was not in distress posture.  The cervical spine was painful to the palpation of spinous processes and the cervical spine's range of motion was mildly to moderately limited.  His left shoulder's range of motion was mildly limited, and Dr. Hostin noted a positive impingement sign.  In the left ankle, Dr. Hostin noted pain in the anterior capsule.  Dr. Hostin's impressions were of cervical and lumbosacral sprain and left ankle sprain. He ruled out internal derangement of the left shoulder and recommended an MRI of the left shoulder.  (Tr. 244, repeated at 267.)

On August 1, 2007, Lynn underwent EMG / NCV studies of his lower extremities.  No results are stated in the report.  (Tr. 228-31.)

6

On August 27, 2007, Lynn had an MRI of his left shoulder.  The MRI did not reveal any tear but the radiologist noted "altered bone marrow signal" and that a bone bruise could not be excluded. The radiologist also noted that "alternative etiologies including reactive changes secondary to degeneration, infectious or inflammatory etiologies cannot be excluded."  (Tr. 238.)  On the same day, Lynn also had an MRI of his cervical spine.  The MRI revealed a focal lesion on the C3 vertebrae "although most likely hemangioma."  The radiologist suggested a bone scan and thin section CT scan through the C3 vertebrae.  (Tr. 239.)

On September 17, 2007, Lynn underwent EMG / NCV studies of his upper extremities.  No results are stated in the report.  (Tr. 226-27.)

On September 24, 2007, Lynn returned to Dr. Morgenstern complaining of left shoulder pain, neck, low back and left ankle pain.  Lynn stated that the neck and low back pain were from the June 20, 2007 accident.  In the physical examination, Lynn's neck was found tender but tested negatively in both the Spurling and Jackson tests.  His lumbar spine was positive for tenderness but tested negatively in the straight leg raise test.  His shoulder was positive for AC joint tenderness and acromian tenderness but negative for coracoid tenderness and negative for impingement.  Dr. Morgenstern's impressions were cervical and lumbar spine sprain, shoulder tendonitis, and an ankle sprain.  He recommended physical therapy, orthopedic consultation regarding a cyst found in Lynn's shoulder MRI, follow up EMG / NCV of the upper and lower extremities, follow up x-rays of the left shoulder and left ankle, and pain management consultation.  (Tr. 270-71.)

The next medical report in the record is that from Lynn's consultative internal medicine examination on January 13, 2009.  This was referred to Dr. Sheldon C. Simon at Industrial Medicine Associates ("IMA") by the Social Security Administration's Division of Disability Determinations, after Lynn filed an application for disability benefits on October 17, 2008.  Lynn

described his June 2007 car accident and complained of low back and left leg pain, both rated as 6/10 in intensity. Lynn stated the pain was worse when the air was moist and cold. He described aching pain in his left shoulder precipitated by lifting something heavy. He stated that he lived with his mother, cooked twice a week, shopped once a week, and was able to shower and dress himself. He did not do laundry because it was too heavy to lift. For recreation, he watched television, listened to the radio, and socialized with friends.

Physical examination of Lynn was unremarkable. Most relevantly, Dr. Simon noted that in general appearance, gait, and station that Lynn appeared in no acute distress. His gait was normal, he could walk on heels and toes without difficulty, fully squat, had no need for assistive devices, did not need help changing for exam or getting on and off the exam table, and was able to rise from a chair without difficulty. In the cervical spine, flexion was to 60 degrees, lateral motion was to 30 degrees bilaterally, and rotation was to 80 degrees bilaterally. No scoliosis or kyphosis or abnormality was noted in the thoracic spine. In the lumbosacral spine, flexion was 45 degrees, lateral was 20 degrees left and right, and rotation was 30 degrees left and right. Straight leg raising was negative bilaterally. Lynn had full range of motion of his shoulders, elbows, forearms, and wrists bilaterally. He had full range of motion of the hips, knees, and extremities. There were no evident subluxations, contractures, ankylosis or thickening. Joints were stable and nontender. No redness, heat, swelling, or effusion was noted. No muscle atrophy was evident in the extremities, and hand and finger dexterity were intact.

Dr. Simon diagnosed Lynn with chronic low back pain secondary to an automobile accident with left leg sciatica, left shoulder injury secondary to an automobile accident, moderate pulmonary emphysema secondary to cigarette smoking, and being moderately overweight. The prognosis was

8

stable for all conditions, except that the stability of the moderate emphysema was dependent on whether Lynn was successful in quitting smoking.  (Tr. 251-54.)

On January 15, 2009, Lynn had an x-ray taken of his lumbosacral spine.  The radiologist detected no acute bony abnormality.  (Tr. 256.)

On March 2, 2009, Lynn returned to NYMDC and saw Dr. Hostin.  Lynn stated that he continued to have some back discomfort despite physical therapy.  The lumbosacral spine was painful to palpation of spinal processes and its range of motion mildly limited.  The thoracolumbar spine was mildly painful to palpation.  X-rays of the lumbosacral spine were unremarkable.  Dr. Hostin's impressions were lower back pain or sprain.  He advised continued physical therapy and prescribed Percocet.  (Tr. 272.)

On May 14, 2009, Lynn underwent a physical therapy evaluation at NYMDC.  Tenderness in the dorsal spine was observed, and the assessment was lumbar radiculitis.  (Tr. 273-74.)

On October 9, 2009, Lynn was seen by Dr. Joseph E. Girschick, a neurologist at NYMDC.  Examination of the cervical, thoracic, and lumbosacral spine showed diffuse muscle pain, which limited range of motion in those areas.  Dr. Girschick's impression was chronic cervical, thoracic and lumbosacral pain/strain and disc disease secondary to a traumatic injury.  He noted that medications, physical therapy and chiropractic care must be continued to maintain satisfactory pain control and quality of life.  (Tr. 277.)

On November 13, 2009, Lynn saw Dr. Girschick for a follow up evaluation.[3]  Lynn stated that therapy had improved his thoracic, lumbosacral, and sciatic symptoms only mildly and that he reinjured his lumbosacral spine as well as injured his cervical spine when he recently lifted a heavy weight.  Upon examination, Dr. Girschick noted diminished range of motion in the cervical and

---

[3] Dr. Girschick's notes state that Lynn was last seen on July 10, 2009, which is inconsistent with Dr. Girschick's October 9, 2009 report of Lynn's examination.

lumbosacral spines secondary to pain, cervical and diffused lumbosacral tenderness in the paraspinal muscles with lumbosacral muscle spasm, bilateral sciatic notch tenderness, and limited motor function due to cervical and lumbosacral pain.  Dr. Girschick's impression was multiple trauma secondary to a motor vehicle accident in 2007 with reinjury of the lumbosacral region in July 2009.  He recommended continued physical therapy, chiropractic care, rest, and Percocet as needed.  (Tr. 278.)

On November 18, 2009, Lynn underwent a physical therapy reevaluation at NYMDC.  He was assessed with lumbar and cervical radiculitis.  (Tr. 279.)

On November 25, 2009, Lynn went to see Dr. Gillman at NYMDC after being involved in another motor vehicle accident the day before, November 24.  Lynn described feeling immediate neck, upper back, and right-sided lower back pain upon impact.  He was taken by ambulance to the emergency room of Flushing Hospital, where he had x-rays taken and was prescribed pain medication.  Lynn complained of headache, dizziness, light-headedness, nausea, feeling mentally sluggish, buzzing and ringing in the right ear, moderate to severe neck pain, increased left shoulder pain, numbness and tingling in both hands, mid and lower back pain, and right hip and right buttock pain.  Dr. Gillman diagnosed him with cervical and lumbar radiculitis; cervical and lumbar disc syndrome; post-traumatic concussion syndrome; cervical, thoracic, and lumbosacral sprain / strain; and segmental dysfunctions at the C1, C2, C4, C5, C6, T2, T4, T5, L2, L4, and L5 levels.  (Tr. 280.)

On December 9, 2009, Lynn had an MRI of his lumbar spine.  This revealed a 2 mm broad-based disc bulge at L4-L5, a 2 mm midline disc bulge at L5-S1, and a mildly narrowed anteroposterior diameter of the neural foramina due to facet joint hypertrophy L4-L5 and L5-S1. (Tr. 324.)

From December 10, 2009 through January 20, 2010, Lynn regularly saw Dr. Gillman and attended physical therapy sessions with Dr. Samuel Boulos, a doctor of physical therapy. Dr. Gillman's progress notes for this period indicate that Lynn complained of neck pain radiating to both shoulders, left shoulder pain, numbness in hands, mid back pain, and lower back pain into both hips, radiating down the left leg with left leg numbness. Sometimes Lynn reported the pain as improved or worse. His cervical and lumbar range of motion fluctuated between "limited and painful" to "improving." He tested positively in the Soto-Hall test, cervical compression test, Kemp's test, Adam's test, and Gaenslen's test. Dr. Gillman noted muscle spasm in the cervical thoracic, and lumbar spines as well as subluxation of various vertebrae. His consistent assessment of Lynn was cervical and lumbar radiculitis, cervical and lumbar disc displacement, and somatic dysfunction of the cervical, thoracic, and lumbar regions. (Tr. 283-304.)

Dr. Boulos's progress notes for this period (December 12, 2009 – January 20, 2009) indicate that Lynn was assessed with back pain and a neck disorder. Dr. Boulos observed tightness in the paraspinal muscles of the cervical and lumbosacral spines, muscle spasm, and reduced range of motion. (Tr. 306-17.)

On January 20, 2010, Dr. Gillman filled out a "Physician's Report for Claim of Disability Due to Physical Impairment" for Lynn. Dr. Gillman stated that he first saw Lynn on 7/16/07 and that Lynn's frequency of treatment ranged from 4-5 times per month to 3-4 times per week, with an average of 2-3 times per week. Lynn's symptoms were neck pain, headache, dizziness, pain, numbness and weakness of extremities, mid and lower back pains, and posterior rib pain. Dr. Gillman described the clinical findings as disc injury in neck and lower back, nerve injury in neck and lower back, fracture of 5th and 6th posterior left ribs, and muscle and vertebral injury, all caused by two separate motor vehicle accidents. Dr. Gillman reported that the SSEP(U) study was

11

abnormal, the NCV(U) testing showed carpal tunnel syndrome and bilateral radiculopathy, the NCV(L) testing showed bilateral peroneal and tibial neuropathy, and the 5th and 6th posterior ribs were fractured.  Dr. Gillman's diagnosis was cervical and lumbar radiculitis, left carpal tunnel syndrome, cervical and lumbar disc syndrome, chronic cervical, thoracic, and lumbar myalgia, and segmental dysfunction of the cervical, thoracic, and lumbar spine.  The prognosis was guarded.  Dr. Gillman opined that Lynn's medical conditions could be expected to last at least 12 months and that Lynn had to lie down for 30-45 minutes at a time during the day due to pain and dysfunction.  He stated that the cause of Lynn's pain was damage to the spinal structure (disc, nerve, and muscle). He opined that in a workplace setting, Lynn could sit continuously for 20-30 minutes, stand continuously for 20-30 minutes, and walk continuously for 15-30 minutes.  He further opined that during an eight-hour workday, Lynn could sit a total of 2-3 hours, stand a total of 2 hours, and walk a total of 2 hours; could lift and carry up to 10 pounds occasionally; could bend and reach occasionally but could not squat, crawl or climb; could use his left hand for simple grasping, pushing and pulling of arm controls, and fine manipulations but could not use the right hand for any of those tasks; and could not use feet for repetitive movements due to the effect on the lower back.[4] Dr. Gillman found that Lynn had mild restrictions in being around moving machinery and moderate restrictions in driving a motor vehicle.  Lynn had no restrictions in activities involving unprotected heights, exposure to marked changes in temperature and humidity, and exposure to dust, fume, and gasses.  Lynn could travel alone on a daily basis by bus or subway.  (Tr. 318-23.)

2.  Medical Expert Evidence

On April 20, 2010, Dr. Louis Lombardi, an orthopedic medical expert, filled out and submitted a "Medical Source Statement of Ability to do Work-Related Activities (Physical)," upon

---

[4] The form defined "occasionally" as 1-33% of the time, "frequently" as 34-66% of the time, and "continuously" as 67-100% of the time.

request of the ALJ.  Dr. Lombardi's opinions were based upon review of medical records provided to him and not on personal examination of Lynn.  (Tr. 343.)  Dr. Lombardi stated he had been provided with sufficient objective medical and other evidence to allow him to form opinions about the nature and severity of Lynn's impairments during the relevant time period.  (Tr. 343.)

Dr. Lombardi opined that Lynn could frequently lift and carry up to 10 pounds and occasionally lift and carry 11-20 pounds.[5]  He concluded Lynn could sit for 6 hours at a time without interruption, stand for 4 hours without interruption, and walk for 4 hours without interruption.  He concluded that Lynn could sit, stand, and walk for 6 hours total during an 8-hour work day.  Regarding the use of hands, Dr. Lombardi opined that Lynn could frequently use both hands to reach (but not overhead), handle, finger, feel, and push/pull.  He found that Lynn could use his right hand to reach overhead frequently and his left hand to do so occasionally.  Regarding the use of feet, Dr. Lombardi opined that Lynn could use both feet to frequently operate foot controls. Regarding postural activities, Dr. Lombardi opined that Lynn could frequently climb stairs, balance, kneel, and crawl, that Lynn could occasionally stoop and crouch, and that Lynn could never climb ladders or scaffolds.  Lastly, Dr. Lombardi opined that Lynn could shop; travel without a companion for assistance; ambulate without using wheelchair, walker, canes or crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed himself; care for his personal hygiene; and sort, handle, or use paper files.  (Tr. 337-42.)

Dr. Lombardi explained that his findings were based on the medical record, which indicated no significant weakness or atrophy in the upper or lower extremities, no pathologic reflexes, no positive tension signs in the upper or lower extremities.  The medical record did not indicate any

---

[5] The form defined "occasionally" as very little to one-third of the time, "frequently" as one-third to two-thirds of the time, and "continuously" as more than two-thirds of the time.

gait disturbance or assistive device use.  There was no indication of motor, sensory, or DTR [deep tendon reflex] abnormality.  There was satisfactory range of motion, and both lower extremities were without atrophy, deformity, or instability of major weight-bearing joints.  Hand and finger dexterity was intact.

Regarding Lynn's MRIs, Dr. Lombardi noted that Lynn's lumbar spine MRI taken on 1/15/09 was negative, and his cervical spine MRI taken on 8/27/07 showed no fractures or herniated discs.  Lynn's left shoulder MRI taken on 8/27/07 showed a bone bruise but no fracture impairment or rotator cuff tear.  Lynn's lumbosacral spine MRI taken on 12/9/09 showed mild arthritis but no herniated discs.  (Tr. 337-38.)  Clinical examination and imaging of the neck was unremarkable. Dr. Lombardi further noted that although Dr. Morgenstern had reported a positive Neer sign for the left shoulder, it was not corroborated by any scans.  He also noted that although another physician reported a decreased range of motion of the lumbar spine, such finding was not quantified nor was it usually the cause of disabling pain.  (Tr. 339.)

In sum, Dr. Lombardi concluded that the medical record failed to demonstrate significant physical impairment of the musculoskeletal central or peripheral nervous system (neck, back, shoulder, chest wall, lower extremities, head, left eye).  The MRIs and x-rays were essentially unremarkable as were the clinical findings.  He further noted that decreased range of motion and positive Neer sign are not competent causes of disabling pain or functional loss.  (Tr. 343-44.)

**IV.  Vocational Expert Testimony**

Vocational expert David Sypher testified at Lynn's February 1, 2010 hearing before the ALJ.  Mr. Sypher categorized Lynn's past work as an electrician as "skilled," with an SVP (specific vocational preparation) level of 7, and construction worker as "semi-skilled," with an SVP level of 4.

14

The ALJ then requested responses to a vocational interrogatory from Amy Leopold, another vocational expert. Ms. Leopold categorized Lynn's past work as an electrician at an SVP level of 8 and construction worker at SVP level 4. The ALJ posed a hypothetical to Ms. Leopold in which he told her to assume an individual of the same age (45), education level, and past work experience as Lynn. Ms. Leopold was to assume further that this individual had the residual functional capacity ("RFC") to perform work as follows: lift and carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk for 6 out of 8 hours and for 4 hours at a time; can occasionally reach overhead with the left upper extremity and otherwise frequently reach, handle, finger, feel, push, and pull with upper extremities; frequently operate foot controls with lower extremities; occasionally stoop and crouch; and frequently balance, kneel, crawl, and climb ramps and stairs. Ms. Leopold was to assume that the individual could never climb ladders or scaffolds.

Ms. Leopold concluded that this individual could not perform Lynn's past work because such work was too physically demanding. She also concluded, however, that the hypothetical person could perform other unskilled jobs that existed in significant numbers in the national economy—namely, a cashier (17,000 jobs locally / 3 million nationally), messenger (22,000 locally / 253,000 nationally), assembler (50,000 locally / 1.6 million nationally), and ticket seller (170,000 locally / 3 million nationally). All of these jobs were classified at SVP level 2 and required light exertion. (Tr. 195-99.)

## STANDARDS OF REVIEW

### I.   Rule 12(c)

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." The standard applied to a Rule 12(c) motion is the same as that applied to a Rule 12(b)(6) motion. Bank of N.Y.

15

v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010).  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  The court must accept all well-pleaded factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party.  Id. at 679; Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 300 (2d Cir. 2003).  The court is limited "to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken."  Allen v. WestPoint-Pepperell, Inc., 945 F.2d 40, 44 (2d Cir. 1991).

Even where, as here, a motion for judgment on the pleadings is unopposed, "'[w]here . . . the pleadings are themselves sufficient to withstand dismissal, a failure to respond to a 12(c) motion cannot constitute 'default' justifying dismissal of the complaint.'"  McCall v. Pataki, 232 F.3d 321, 322 (2d Cir. 2000) (quoting Maggette v. Dalsheim, 709 F.2d 800, 802 (2d Cir. 1983)).  The Second Circuit has also held, in the context of an unopposed motion for summary judgment, that courts must review the record and determine whether the moving party has established its entitlement to judgment as a matter of law.  Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004); see also Martell v. Astrue, 09 CIV. 1701 NRB, 2010 WL 4159383, at *2 n.4 (S.D.N.Y. Oct. 20, 2010) (noting similarity between unopposed motion for summary judgment and unopposed motion for judgment on the pleadings in social security context, "where there is a fulsome record of the underlying administrative decision").  Accordingly, the Court has thoroughly reviewed the record and tested the sufficiency of plaintiff's claim in considering the Commissioner's unopposed motion for judgment on the pleadings.

Further, where a plaintiff proceeds *pro se*, the Court construes the pleadings liberally and

interprets them to raise the strongest arguments they suggest.  Burgos v. Hopkins, 14 F.3d 787, 790

(2d Cir. 1994).

## II.  Administrative Review

"It is not the function of a reviewing court to determine *de novo* whether a claimant is

disabled."  Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984).  In reviewing a final decision of

the Social Security Administration ("SSA"), the Court "is limited to determining whether the SSA's

conclusions were supported by substantial evidence in the record and were based on a correct legal

standard."  Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Lamay v. Comm'r of Soc.

Sec., 562 F.3d 503, 507 (2d Cir. 2009)); accord Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999)

("In reviewing the Commissioner's denial of benefits, the courts are to uphold the decision unless it

is not supported by substantial evidence or is based on an error of law.").  "Substantial evidence is

'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  Selian v. Astrue, -- F.3d --, No. 12-871, 2013 WL 627702, at

*6 (2d Cir. Feb. 21, 2013) (alteration omitted) (quoting Richardson v. Perales, 402 U.S. 389, 401

(1971)).  In determining whether the Commissioner's findings were supported by substantial

evidence, "'the reviewing court is required to examine the entire record, including contradictory

evidence and evidence from which conflicting inferences can be drawn.'"  Id. (quoting Mongeur v.

Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983)).  However, the Court keeps in mind "that it is up to

the agency, and not this court, to weigh the conflicting evidence in the record."  Clark v. Comm'r of

Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).

## DISCUSSION

## I.  Evaluating Disability Under the Social Security Act

Under the Social Security Act, an individual is disabled if he is unable "to engage in any

17

substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner follows a five-step analysis to determine whether a claimant is disabled within the meaning of the Act.  See 20 C.F.R. § 404.1520; Talavera, 697 F.3d at 151; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

First, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity."  If so, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(i).

If not, the Commissioner proceeds to the second inquiry, which is whether the claimant suffers from a medical impairment or combination of impairments that is "severe," meaning that the impairment "significantly limits [claimant's] physical or mental ability to do basic work activities." If the impairment is not severe, claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(ii), (c).

If the impairment is severe, the Commissioner proceeds to the third inquiry, which is whether the impairment meets or equals one of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Social Security regulations.  If so, the claimant is presumed disabled and entitled to benefits.  20 C.F.R. § 404.1520(a)(4)(iii).

If not, the Commissioner proceeds to the fourth inquiry, which is whether, despite claimant's severe impairment, he has the "residual functional capacity" (RFC) to perform past work.  20 C.F.R. § 404.1520(a)(4)(iv).  In determining a claimant's residual functional capacity, the Commissioner considers all medically determinable impairments, even those that are not "severe." 20 C.F.R. § 404.1545(a).   If the RFC is such that the claimant can still perform past work, the claimant is not disabled.

If the claimant cannot perform past work, the Commissioner proceeds to the fifth and final inquiry, which is whether, in light of the claimant's RFC, age, education, and work experience, the

claimant has the capacity to perform other substantial gainful work which exists in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled and entitled to benefits. 20 C.F.R. § 404.1520(a)(4)(v); 42 U.S.C. § 423(d)(2)(A).

The claimant bears the burden of proving his case at steps one through four; at step five, the burden shifts to the Commissioner to establish there is substantial gainful work in the national economy that the claimant could perform. Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004).

**II. The ALJ's Decision**

Applying the above five-step analysis to Lynn's case, the ALJ concluded that Lynn was not disabled within the meaning of the Social Security Act. First, the ALJ determined that Lynn had not engaged in substantial gainful activity since June 20, 2007, the alleged onset date. At step 2, the ALJ determined that Lynn suffered the following severe combination of impairments: degenerative disc disease and joint disease of the lumbar spine, a cervical spine impairment, a left shoulder impairment, and obesity. The ALJ further found that Lynn's pulmonary impairment, rib fractures, and alleged mental impairment did not cause more than a minimal limitation in his ability to perform basic work activities and were therefore non-severe. At step 3, the ALJ determined that Lynn did not have an impairment or combination of impairments that met or equaled one of the impairments listed in Appendix 1 to Subpart P of Part 404 of the Social Security regulations. The ALJ then determined that Lynn had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b). Based on this RFC, the ALJ determined that Lynn was unable to perform any past relevant work per 20 C.F.R. § 404.1565 but that, considering Lynn's age, education, and work experience in addition to his RFC, he could perform other jobs that existed in significant numbers in the national economy. Thus, the ALJ concluded that Lynn was not disabled under the Social Security Act. (Tr. 11-25.)

### III. Review of the ALJ's Decision

A. <u>The ALJ Applied the Correct Legal Standards</u>

In denying plaintiff's application for disability benefits, the ALJ clearly followed the regulatory five-step procedure. Thus, Lynn could not challenge the ALJ's decision on that basis. However, Lynn could potentially argue that the ALJ did not fulfill his duty to develop the record in determining the severity (or rather, in his case, the non-severity) of his alleged mental impairment. The Second Circuit has counseled that "[i]t is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" <u>Pratts v. Chater</u>, 94 F.3d 34, 37 (2d Cir. 1996) (quoting <u>Echevarria v. Secretary of HHS</u>, 685 F.2d 751, 755 (2d Cir. 1982)) (alteration in original); <u>see also</u> 20 C.F.R. § 404.1512(d) (detailing the Commissioner's regulatory obligations to develop the medical record before making a disability determination).

The Court notes as an initial matter that Lynn first alleged a mental impairment at his hearing. He stated in his application for disability benefits that he was disabled due to back, neck, and ankle problems. (Tr. 72, 80, 156-57, 161.) In his request for a hearing after the initial denial of his claim, Lynn stated that he was disabled due to a back injury. (Tr. 80.) Then, at his hearing, Lynn discussed for the first time being diagnosed with depression and having general feelings of anxiety. (Tr. 44-48.) At the end of the hearing, the ALJ noted the lack of any psychiatric records and kept the record open for submission of those and other documents. (Tr. 60.) Neither Lynn nor his counsel ever submitted any medical evidence of mental impairment or other additional evidence. The ALJ thus relied on Lynn's own testimony to conduct a functional limitation analysis and conclude that alleged mental impairment was non-severe. (Tr. 14.)

20

The duty to develop the record exists to ensure that the ALJ's decision is based upon an adequate record.  See, e.g., Smith v. Astrue, No. 11-CV-5627 DLI, 2013 WL 1192989, at *9 (E.D.N.Y. Mar. 22, 2013) ("As part of the ALJ's fundamental duty to develop the record, he is responsible for seeking additional information when the treating physician has not provided an adequate basis to determine a claimant's disability."); Clark v. Astrue, No. 08 CIV. 10389 (LBS), 2010 WL 3036489, at *6 (S.D.N.Y. Aug. 4, 2010) ("[T]o the extent that Dr. Leung's diagnosis was too unclear or incomplete to allow an adequate determination of Plaintiff's alternative mental residual functional capacity, the ALJ had a duty to develop the record.").  Thus, for example, the ALJ is not obligated to obtain duplicative evidence.  See Pagan v. Astrue, No. 5:11-CV-825, 2012 WL 2206886, *8 (N.D.N.Y. June 14, 2012) (finding ALJ was not required to obtain copies of MRIs as they would be duplicative of evidence already considered by the ALJ).  In this case, it is not clear that the record was in fact inadequate.  Lynn himself apparently did not feel that his alleged mental impairment was so debilitating as to list it as a basis for disability benefits in the first place, and his testimony at his hearing failed to establish that his alleged mental impairment was of such severity that it would significantly limit his ability to do basic work activities.  The Court is doubtful that, even had Lynn submitted medical records confirming his testimony, such records would have meaningfully added to the record.

But even assuming that the ALJ's duty was triggered, the Court cannot conclude that the ALJ failed to fulfill it.  The ALJ requested Lynn's psychiatric records, kept the record open for submission of those documents, and neither Lynn nor his counsel ever contacted the ALJ requesting additional time or any other assistance in obtaining such documents.  In these circumstances, the ALJ was entitled to make a decision based on the available record.  See 20 C.F.R. § 404.1516 ("If you do not give us the medical and other evidence that we need and request, we will have to make a

decision based on information available in your case."); see also Rivera v. Comm'r of Soc. Sec., 728 F.Supp.2d 297, 330 (S.D.N.Y. 2010) ("[T]he ALJ's request that plaintiff's attorney obtain the recent treatment records from Lincoln Hospital fulfilled his obligations with regard to developing the record."); Pagan v. Astrue, No. 11–CV–825, 2012 WL 2206886, at *8 (N.D.N.Y. June 14, 2012) (holding that ALJ satisfied the duty to develop the record by granting counsel additional time to obtain evidence and providing opportunity to request a further extension); cf. Jordan v. Comm'r of Soc. Sec., 142 F. App'x 542 (2d Cir. 2005); but see Newsome v. Astrue, 817 F. Supp. 2d 111, 137-38 (E.D.N.Y. 2011) ("The fact that the ALJ requested additional information from the Plaintiff's attorney and did not receive that information does not relieve the ALJ of his duty to fully develop the record."); Apolito v. Astrue, No. 11-CV-1065 TJM/VEB, 2012 WL 6787365, at *4-5 (N.D.N.Y. Nov. 5, 2012) (finding ALJ failed duty to develop the record where the ALJ did not issue a subpoena or advise counsel of the availability of a subpoena to obtain psychiatric records before closing the record), report and recommendation adopted sub nom. Apolito v. Comm'r of Soc. Sec., 2013 WL 66706 (N.D.N.Y. Jan. 4, 2013). For these reasons, the Court will not overturn the ALJ's decision as contrary to law.

   B.   The ALJ's Decision is Supported by Substantial Evidence

        In assessing a claimant's RFC, the ALJ must consider all of the relevant medical and other evidence in the case record to assess the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(3)-(4); SSR 96-8P, 1996 WL 374184 (S.S.A. July 2, 1996). The ALJ considers all of the claimant's impairments, including those that are determined non-severe. 20 C.F.R. § 404.1545(a)(2). In considering a claimant's assertions of pain and other symptoms, the ALJ follows a two-step process. First, the ALJ determines whether there is an underlying medically determinable physical or mental impairment that could reasonably be

expected to produce the pain or other symptoms.  Only "acceptable medical sources" as defined by the Social Security regulations can provide evidence to establish a medically determinable impairment.  20 C.F.R. § 404.1513(a).  "Acceptable medical sources" are licensed physicians (medical or osteopathic doctors), licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  Other sources, such as nurses, therapists, and chiropractors, as well as non-medical personnel, may evidence the severity of an impairment and how the impairment affects the claimant's ability to function.  See 20 C.F.R. § 404.1513; SSR 06-03P, 2006 WL 2329939 (S.S.A. Aug. 9, 2006).

Once a medically determinable impairment has been shown, the ALJ then considers the extent to which the claimant's symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence.  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010); 20 C.F.R. § 404.1529(a); SSR 96-4P, 1996 WL 374187 (S.S.A. July 2, 1996).  In making this second determination, the ALJ considers all of the evidence in case record, including statements or reports from the claimant and the claimant's treating or nontreating sources about the claimant's medical history, diagnosis, prescribed treatment, daily activities, and efforts to work, and any other evidence showing how the claimant's impairment(s) and any related symptoms affect the claimant's ability to work.  20 C.F.R. § 404.1529(a).  And although the ALJ is required to take the claimant's reports of pain and other limitations into account, the claimant's statements alone cannot establish disability, see id. and Genier, 606 F.3d at 49, and the ALJ is "not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record."  Genier, 606 F.3d at 49 (citations omitted); see also Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979) ("The ALJ has discretion to

evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant.").

Here, the ALJ found that Lynn had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) in that Lynn could lift/carry 20 pounds occasionally and ten pounds frequently; could sit for six out of eight hours; could stand and walk for four hours at a time for a total of 6 out of 8 hours; could occasionally reach overhead with the left upper extremity but could otherwise frequently reach, handle, finger, feel, and push/pull with the upper extremities; could frequently operate foot controls with the lower extremities; could frequently climb ramps and stairs, balance, kneel, and crawl; could occasionally stoop and crouch; and could never climb ladders or scaffolds. (Tr. 15.)

In coming to this RFC, the ALJ undertook a thorough review of the entire record (Tr. 15-21), in accordance with the governing regulations.  He gave the greatest weight to Dr. Lombardi's opinion.  The ALJ explained that although Dr. Lombardi was not an examining physician, he is a specialist in orthopedics, had the opportunity to review the entire record, and his findings were consistent with the overall record.  The ALJ gave considerable weight to the opinion of Dr. Simon, the consultative examining physician, as Dr. Simon had personally examined Lynn and his findings were consistent with the overall record.  The ALJ gave limited weight to Dr. Gillman's opinion. The ALJ explained that Dr. Gillman, as a chiropractor, was not an "acceptable medical source" according to the Social Security guidelines.  Thus, his opinion could not be the basis for finding a medical impairment.[6]  And although his opinion would be relevant to show the severity of an

---

[6] For the same reason Dr. Gillman is not considered a "treating physician," whose opinion is given controlling weight if well supported by medically acceptable clinical and laboratory techniques and not inconsistent with the other substantial evidence in the record.  See 20 C.F.R. § 404.1527(a)(2), (c), (d)(2); SSR 06-03P, 2006 WL 2329939 (S.S.A. Aug. 9, 2006); Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (discussing "treating physician" rule).

impairment and how it would affect Lynn's ability to work, the ALJ found that the limitations assessed by Dr. Gillman were not supported by the overall record.  (Tr. 22.)

It is the province of the ALJ to weigh conflicting evidence in the record and credit that which is more persuasive and consistent with the record as a whole.  See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve." (citing Richardson v. Perales, 402 U.S. 389, 399 (1971))); Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998) ("It is for the SSA, and not this court, to weigh the conflicting evidence in the record.").  As long as the ALJ's determination is supported by substantial evidence, the Court will not disturb his decision.

The ALJ's conclusions are supported by substantial evidence.  Lynn's x-rays and MRIs, including the MRI taken after his second accident, were unremarkable other than the possibility of a bone bruise indicated in the August 27, 2007 MRI of his left shoulder.  And although the medical assessments as to the extent of Lynn's physical limitations were varied, none determined that Lynn was rendered completely sedentary.  The January 13, 2009 CDI surveillance showed that Lynn could move about fluidly and without difficulty at that time.  Subsequent examinations indicating that Lynn experienced limited range of motion and motor function are not inconsistent with an RFC determination that Lynn is capable of light work.  Further, as the ALJ noted, Lynn's allegations as to the intensity, persistence, and limiting effects of his pain were undermined by evidence of consistently conservative medical treatment, limited use of medication, attendance of classes at Queensborough College, Lynn's ability to drive, socialize, and perform certain personal care needs and housekeeping chores, and the fact that Lynn certified as to his ability to work in order to collect unemployment insurance benefits.  This is "such relevant evidence as a reasonable mind might accept as adequate to support" giving more weight to the opinions of Drs. Lombardi and Simon,

giving less weight to Dr. Gillman's opinion, and ultimately concluding that Lynn is capable of light work as defined above.

## CONCLUSION

The Court finds that the ALJ applied the correct legal standards and that his decision is supported by substantial evidence.  Accordingly, the Commissioner's motion for judgment on the pleadings is granted.  ALJ Lahat's decision is affirmed.  The Clerk of the Court is directed to enter judgment and to close this case.

SO ORDERED.




Dated: Brooklyn, New York
       March 30, 2013

                                        _____/s/_____
                                        Carol Bagley Amon
                                        Chief United States District Judge